UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HENRY MUNOZ, an individual,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF BURLEY, an Idaho municipality,<br><br>Defendant. | Case No. 4:24-cv-00303-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is Defendant City of Burley's Motion for Summary Judgment (Dkt. 19). Having reviewed the record and the parties' submissions, the Court finds that the facts and legal argument are adequately presented and that oral argument would not significantly aid its decision-making process, and it decides the motion on the parties' briefing. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B); *see also* Fed. R. Civ. P. 78(b). For the reasons set forth below, the Court grants the motion.

## INTRODUCTION

This case concerns the City of Burley Fire Department's (BFD) 2022 decision to promote Bradley Boden, rather than Plaintiff Henry Munoz, to Captain. The City's stated reason for the decision is that Boden received the highest assessment-center score. Plaintiff contends this reason is pretextual because Boden allegedly was not qualified, scoring was subjective, outside evaluators

**MEMORANDUM DECISION AND ORDER - 1**

gave Plaintiff unusually low scores, and the BFD's leadership and promotion history lack Hispanic and non-LDS representation.[1]

The record supports Plaintiff's criticism that the assessment process involved substantial discretion and produced significant evaluator disparities. The evidence would permit a reasonable jury to question whether the assessment process was well calibrated, consistently scored, or optimally designed. However, the statutes under which Plaintiff asserts his clams, Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e to 2003-17, and the Idaho Human Rights Act (IHRA), Idaho Code §§ 67-5901, *et seq.*, do not require the best process to select the best candidate. The issues are whether Defendant's stated reliance on the highest assessment-center score was false and whether race or religion was a motivating factor in the decision. On this record, Plaintiff has not made that showing. Because the record does not create a genuine dispute regarding whether Defendant's score-based explanation was pretext for race or religious discrimination, Defendant is entitled to summary judgment.

## FACTUAL BACKGROUND

Many of the core historical facts are not materially disputed. Plaintiff does not dispute that BFD implemented updated job descriptions for Lieutenants and Captains in January 2022; the January 2022 requirements were subject to a grace period; Plaintiff, Boden, and Jensen were allowed to participate in the June 2022 Captain selection process; BFD used an assessment center; and Boden received the highest total score. Plaintiff's disputes largely concern the legal and factual inferences to be drawn from those facts—specifically, whether the grace-period policy shows Plaintiff and Boden were both qualified, whether the assessment process was sufficiently

---

[1]    The Court uses LDS, as do the parties, as shorthand reference for the Church of Jesus Christ of Latter-day Saints.

MEMORANDUM DECISION AND ORDER - 2

subjective to permit pretext, and whether the resulting promotion decision reflected race or religion discrimination.

Plaintiff is Hispanic and Catholic (Dkt. 22-2 at 1-2). He began working for the BFD as a volunteer firefighter in March 2001, became a full-time firefighter in November 2003, and was promoted to Lieutenant in 2013 (Dkt. 22-2 at 1-2; Dkt. 22-4 at 2). Plaintiff remained a Lieutenant when he applied for the Captain position at issue in this case (Dkt. 22-2 at 1-2; Dkt. 22-4 at 2). Plaintiff declares that he has served BFD for more than twenty-four years and has never been disciplined for misconduct (Dkt. 22-2 at 2).

According to Plaintiff, the full-time BFD ranks, in ascending order, are Firefighter I, Firefighter II, Lieutenant, Captain, Deputy Chief, and Chief (Dkt. 22-2 at 2). Plaintiff declares that BFD currently has eleven full-time firefighters, including one Chief, one Deputy Chief, three Captains, three Lieutenants, and three Firefighter IIs, and approximately twenty-one to twenty-six volunteer firefighters (Dkt. 22-2 at 2). Plaintiff declares that the five employees holding BFD's three highest-ranking positions—Captain, Deputy Chief, and Chief—are Caucasian, and that four have had substantial involvement with the LDS church (Dkt. 22-2 at 3-4). Plaintiff identifies Boden as Caucasian and LDS (Dkt. 22-2 at 3-4).

In January 2022, BFD implemented updated job descriptions for Lieutenants and Captains. Under the updated January 2022 Lieutenant description, the position required, among other things, State International Fire Service Training Association (IFSTA) Certification FF II; State IFSTA Certification Driver Operator; State IFSTA Certification Hazmat Operations; State IFSTA Certification Fire Instructor 1; and Certification ICS 100, 200, IS 700 & 800 (Dkt. 19-5 at 8). The updated Captain description required "Lieutenant requirements plus" State IFSAC Certification Company Officer 1 and ICS 300 (Dkt. 19-5 at 12). The updated Captain description also stated

**MEMORANDUM DECISION AND ORDER - 3**

that "any combination of experience and training [likely providing] the required knowledge and abilities" would qualify, and it described five years of increasingly responsible full-time fire-department experience, including at least two years as a Lieutenant, as a "typical" and "preferred" pathway (Dkt. 19-5 at 12). Although disputed between the parties, the record reveals that BFD implemented a three-year grace period for employees to become compliant with the new job descriptions; an employee could qualify for a position even if not yet compliant with its new job description (Dkt. 22-2 at 2; Dkt. 22-6, Harman Dep. 15:13-16:9, 17:20-25).

In June 2022, Plaintiff applied for an open Captain position (Dkt. 22-2 at 2). BFD also received applications from Boden and Justin Jensen (Dkt. 19-1 at 2). Plaintiff had been a Lieutenant since March 2013 (Dkt. 22-4 at 2). Boden had been promoted to Lieutenant on December 18, 2021, before being promoted to Captain on July 6, 2022 (Dkt. 22-4 at 1-2). Plaintiff testified that, as of 2022, he did not have certain certifications required by the updated descriptions, including State IFSAC Certification Company Officer 1, although he testified he had ICS 300 (Dkt. 22-5, Munoz Dep. 66:18-68:15, 126:13-25). Plaintiff declares that BFD provided the candidates with the pre-January 2022 Captain classification description; Chief Tolman explained the pre-January 2022 description would apply because the three-year grace period had not expired; and Plaintiff had earned the licenses and certificates required to qualify as Captain under that pre-January 2022 description (Dkt. 22-2 at 2-3).

Deputy Chief Casey Harman testified he was involved in determining who met the minimum qualifications for the June 2022 Captain process; Plaintiff, Boden, and Jensen each met the minimum qualifications to interview; and Plaintiff was permitted to apply because the January 2022 job-description changes included a grace period during which employees who did not yet meet the new qualifications could still apply (Dkt. 22-6, Harman Dep. 15:13-16:9). In determining

MEMORANDUM DECISION AND ORDER - 4

whether a candidate was qualified at the beginning of the process, Harman reviewed the candidate's resume, application, and certificates against the job descriptions; he also testified that because the promotional process was internal, BFD knew the candidates' capabilities (Dkt. 22-6, Harman Dep. 15:23-16:9, 18:22-20:7).

Deputy Chief Harman testified that Boden had been through or was finishing a Fire Officer 1 class, had multiple national certifications, had experience, and had shown leadership capabilities (Dkt. 19-4, Harman Dep. 18:2-10). Deputy Chief Harman also testified that Jensen "met everything up to the new job description qualifications as well" (Dkt. 19-4, Harman Dep. 18:18-21).

BFD used an "assessment center" to evaluate the three candidates. The assessment center used five evaluators: Chief Shannon Tolman; Deputy Chief Harman; Human Resources (HR) Director, Carol Anderson; Cassia Regional Hospital ambulance department manager, Keisha Hendrickson; and College of Southern Idaho Lead Fire Science Instructor, Brad Buehler (Dkt. 19-1 at 3; Dkt. 19-3 at 48, 51, 54, 57, 60). Deputy Chief Harman selected the internal evaluators and Buehler and Hendrickson as outside evaluators (Dkt. 22-6, Harman Dep. 23:23-24:11, 41:23-42:11, 43:4-44:2). Of those evaluators, Plaintiffs identifies only Chief Tolman as having LDS involvement (Dkt. 22-2 at 4).

The assessment center has three components: an incident-scenario exercise, an oral-presentation exercise, and an oral interview (Dkt. 19-3 at 10, 13, 15, 17). Each component's individual score sheets included job-related scoring dimensions such as scene size-up, leadership/organization, communication, problem analysis and decision-making, time management, strategy and tactics, command presence/ICS, safety, presentation-related criteria, accountability, and interview performance (Dkt. 19-3 at 13, 15, 17). The score sheets used an

MEMORANDUM DECISION AND ORDER - 5

unevenly-banded numerical scale: 1 through 4 meant "Not Qualified," 5 meant "Minimally Qualified," 6 meant "Qualified," and 7 through 10 meant "Especially Qualified" (Dkt. 19-3 at 13, 15, 17). Hypothetically applied, a "4" means the evaluator found the applicant not qualified in that dimension of that component, whereas a "7" means the applicant was especially qualified. The scoring draws no distinction between a 1 and a 4 (both "not qualified") or a 7 and a 10 (both "especially qualified").

The packet states in its general assessment center description that, although each exam phase would have "its own relative weight," the "overall acceptable standard is 70% throughout the entire process to attain a space on the eligibility list for Captain" (Dkt. 19-3 at 10). The packet does not expressly define what score or scoring denominator the 70 percent standard measures. Elsewhere, the packet repeats a 70 percent minimum standard only for the oral-presentation component, stating that the "oral presentation simulation consists of a possible eighty (80) points with a minimum acceptable standard of 70%" (Dkt. 19-3 at 14). It does not include the same component-specific 70% language for the incident-scenario or oral-interview components (Dkt. 19-3 at 12-17).

Each evaluator could award up to 80 points per assessment component, meaning each component totaled 400 raw points across the five evaluators (Dkt. 19-3 at 13, 15, 17, 48-62). Thus, if the 70 percent standard were applied to the 1,200 aggregate raw points available across all three components, the threshold would be 840 points; however, the packet does not expressly state that the 70 percent standard is calculated against that aggregate raw-point total.

After the assessment, Chief Tolman and Deputy Chief Harman totaled the evaluators' scores. The completed score sheets reflect that Plaintiff received a total score of 760 out of 1,200, while Boden received the highest total score, 957 out of 1,200 (Dkt. 19-3 at 48-62; Dkt. 19-1 at 4-

MEMORANDUM DECISION AND ORDER - 6

5). According to Defendant, the promotion was offered to the candidate who received the highest score, and Deputy Chief Harman testified that "the past processes since '21 have all gone based off of the score" (Dkt. 19-1 at 4-5; Dkt. 19-4, Harman Dep. 21:1-2, 68:14-15).

The completed score sheets reflect substantial differences among evaluators. On the incident-scenario exercise, the inside evaluators scored Munoz at 74, 58, and 73  out of 80; the outside evaluators scored Munoz at 38 and 26 out of 80 (Dkt. 19-3 at 48, 51, 54, 57, 60). Buehler's 38-point incident-scenario score was the lowest score that Buehler gave any candidate in any assessment category. Hendrickson's 26-point incident-scenario score was likewise the lowest score that Hendrickson gave any candidate in any assessment category; it was lower than the scores Hendrickson gave Jensen and Boden in every assessment category, and two points lower than the 28-point scores Hendrickson gave Plaintiff for the oral-presentation and oral-interview components (Dkt. 22 at 18-19; Dkt. 19-3 at 57, 60-63).

The outside evaluator disparity was not limited to the incident-scenario component. The completed score sheets reflect that Buehler gave Plaintiff 38, 41, and 44 points across the three assessment components, for a total of 123 out of 240. Hendrickson gave Plaintiff 26, 28, and 28 points, for a total of 82 out of 240 (Dkt. 19-3 at 57-62; *see also* Dkt. 22-8, Anderson Dep. 43:16-44:12). Together, the two outside evaluators gave Plaintiff 205 out of 480 possible points (Dkt. 19-3 at 57-62). Each offered differing rationales.

Buehler testified that, when scoring the "educational background" component, he considered a "motivational factor," including where candidates were in their careers, how long they had been with the department, and what certifications they had; he reasoned that someone who had been with the BFD for fifteen years with only minimal certifications could appear less

motivated than someone who had been with the department for a year or two and was "getting cert after cert" (Dkt. 22-9, Buehler Dep. 20:14-21:5).

Hendrickson scored Plaintiff "Not Qualified" in 21 of 24 performance dimensions, "Minimally Qualified" in two dimensions, and "Qualified" in one dimension (Dkt. 19-3 at 60-62). By contrast, Chief Tolman scored Plaintiff "Especially Qualified" in 22 of 24 dimensions and "Qualified" in the other two dimensions (Dkt. 19-3 at 48-50). Hendrickson testified that she did not remember the specifics of why she scored Plaintiff "Not Qualified" in each incident-scenario dimension, but she recalled that Plaintiff was "very argumentative" during the scenario; "it was awkward how he was handling it"; and his comments affected her evaluation (Dkt. 22-10 at 35:23-36:5). She further testified that she considered Plaintiff's argumentative or awkward presentation across the incident-scenario categories because, in her view, he questioned the scenario rather than simply giving the scene size-up, and his manner of questioning reflected on leadership and safety (Dkt. 22-10 at 37:1-22). Hendrickson also wrote on Plaintiff's oral-interview rating form, "Seemed angry – bitter comments," and she testified that Plaintiff's answers included frustration, bitter, and angry comments (Dkt. 22-10 at 40:12-21).

The record also contains evidence concerning post-assessment discussions. HR Director Anderson testified that, although she did not recall the exact discussion, evaluators typically would discuss the process at the end of an interview, including what happened, things that were said and done, and the overall scores, but she did not recall discussing the scores each evaluator assigned (Dkt. 22-8, Anderson Dep. 38:8-39:7). After the scores were totaled, Deputy Chief Harman discussed with Chief Tolman, HR Director Anderson, and the city administrator how the overall points came out, who scored highest, how the candidates ranked, and the point spread among the candidates (Dkt. 22-6, Harman Dep. 67:9-68:24). Deputy Chief Harman further testified that they

did not pull out the score sheets and discuss each evaluator's individual scoring sheet, and that he did not have one-on-one discussions with the individual evaluators about their scoring (Dkt. 22-6, Harman Dep. 67:9-69:5, 70:8-11).

Plaintiff testified that religion did not come up during the interview or testing process; no panelist raised religion during the process; Chief Tolman and Deputy Chief Harman never talked with him about his religion; he never raised religion with them; and he did not know whether Chief Tolman or Deputy Chief Harman knew his religion (Dkt. 22-5, Munoz Dep. 103:25-104:21). Buehler testified that he was not aware of any applicant's religious affiliation or whether one applicant was affiliated religiously differently from the others, and that the scores he gave Plaintiff were not motivated by Plaintiff's religion or national origin (Dkt. 22-9, Buehler Dep. 40:17-41:2). Hendrickson likewise testified she was not aware of the religion of any applicant and that the scores she gave Plaintiff were not motivated by Plaintiff's religion or national origin (Dkt. 22-10, Hendrickson Dep. 47:19-24).

Plaintiff filed this action asserting claims for race and religious discrimination under Title VII and the IHRA (Dkt. 1). Defendant now moves for summary judgment (Dkt. 19).

## LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

MEMORANDUM DECISION AND ORDER - 9

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. To defeat a summary judgment motion, the nonmoving party need only present evidence on which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017). The nonmoving cannot simply rely on an unsworn affidavit or the pleadings to defeat a summary judgment motion; rather, the nonmoving party must set forth the "specific facts," supported by evidence, with "reasonable particularity" that preclude summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001). If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

The trial court's role at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Zetwick*, 850 F.3d at 441. At the summary judgment stage, the trial court must view the evidence in the light most favorable to the nonmoving party. If evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The trial court must enter summary judgment if a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

MEMORANDUM DECISION AND ORDER - 10

Title VII makes it unlawful for an employer to discriminate against an employee because of race or religion. 42 U.S.C. § 2000e-2(a)(1). The IHRA is generally analyzed under the same framework as Title VII for purposes of employment-discrimination claims. *See Bowles v. Keating*, 606 P.2d 458, 463-64 (1979); *Hatheway v. Bd. of Regents of Univ. of Idaho*, 310 P.3d 315, 323 (2013). Under Title VII, the plaintiff need only "demonstrate[] that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the [unlawful employment] practice." 42 U.S.C. § 2000e-2(m) (emphasis added).

The Court uses the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, Munoz must first establish a prima facie case of discrimination by showing that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) similarly situated persons not in his protected class were treated more favorably. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002). In conducting this analysis, the Court must keep in mind that the requisite degree of proof necessary to establish a prima facie case for Title VII discrimination on summary judgment is minimal and does not even rise to the level of a preponderance of the evidence. *Id.*

If a plaintiff establishes a prima facie case, the burden shifts to the defendants to articulate a legitimate, nondiscriminatory reason for the challenged action. *Id.* at 1064. If the defendant meets his burden, then the plaintiff must show that the defendant's articulated reason is pretextual either through direct evidence of discriminatory intent or circumstantial evidence showing that the defendant's proffered explanation is unworthy of credence. *Id.* at 1062.

Alternatively, a plaintiff can prevail merely by showing direct or circumstantial evidence of discrimination; he does not need to use the *McDonnell Douglas* framework to establish a prima facie case. *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) (holding that a

MEMORANDUM DECISION AND ORDER - 11

plaintiff "may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated" the employer). "[R]egardless of the approach a plaintiff takes . . .—i.e., establishing the prima facie case via direct or circumstantial evidence or the *McDonnell Douglas* factors—once an employer articulates some legitimate, nondiscriminatory reason for the challenged action, the employee must show that the articulated reason is pretextual." *Opara v. Yellen*, 57 F.4th 709, 723 (9th Cir. 2023).

## ANALYSIS

### A.    Prima Facie Case

The parties dispute whether Plaintiff has established a prima facie case. The City principally argues Plaintiff cannot establish a prima facie case because he did not meet the January 2022 Lieutenant and Captain job descriptions when he applied for Captain in June 2022. The City points to Plaintiff's deposition testimony that he lacked certain certifications required by those descriptions. Plaintiff responds that the grace-period policy allowed him to apply; BFD in fact deemed him qualified to participate in the assessment; and the prior job descriptions governed during the grace period.

Plaintiff testified that, as of 2022, he did not have certain certifications nominally identified on the 2022 Captain job description, including State IFSAC Certification Company Officer 1, although he testified he had ICS 300 (Dkt. 22-5, Munoz Dep. 66:18-68:15, 126:13-25). That does not end the prima facie inquiry, however, because the record also contains evidence that the updated certification requirements were subject to a grace period and were not used as an absolute bar to applying or interviewing for any candidate in June 2022. Further, BFD provided the candidates with the pre-January 2022 Captain classification description; Chief Tolman explained

**MEMORANDUM DECISION AND ORDER - 12**

the pre-January 2022 description would apply because the three-year grace period had not expired; and Plaintiff had earned all licenses and certificates required to qualify as a Captain under that pre-January 2022 description (Dkt. 22-2 at 2-3). Deputy Chief Harman was involved in determining who met the minimum qualifications for the June 2022 Captain process and testified that Plaintiff, Boden, and Jensen each met the minimum qualifications to interview. Deputy Chief Harman also testified that Plaintiff was permitted to apply because the January 2022 job-description changes included a grace period during which employees who did not yet meet the new qualifications could still apply (Dkt. 22-6, Harman Dep. 15:13-16:9, 17:20-25). In determining qualification, Chief Deputy Harman reviewed the candidate's resume, application, and certificates against the job descriptions, and explained that because the promotional process was internal, BFD also knew the candidates' capabilities (Dkt. 22-6, Harman Dep. 15:23-16:9, 18:22-20:7).

Viewed in Plaintiff's favor, this evidence is enough at the prima facie stage to permit a reasonable jury to find that Plaintiff was qualified for the Captain position, notwithstanding Defendant's argument that he did not meet the updated January 2022 certification requirements. The Court therefore assumes without deciding that Plaintiff has satisfied his minimal burden to establish a prima facie case.

## B.      Legitimate Nondiscriminatory Reason

Defendant has articulated a legitimate, nondiscriminatory reason for promoting Boden instead of Plaintiff: they selected Boden because he received the highest total score in the assessment center (Dkt. 19-3 at 48-62). After qualified applicants completed the assessment, the decision was made by totaling "the scores up on all of the interview score sheets" in accord with "[t]he past processes since '21" (Dkt. 19-4, Harman Dep. 20:18-21:5). Plaintiff does not dispute

that Defendant's score-based explanation is facially legitimate and nondiscriminatory, but he argues the explanation is pretextual (Dkt. 22 at 8-9).

## C.    Pretext

A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981); *see also Chuang v. Univ. of California Davis, Bd. of Trs.*, 225 F.3d 1115, 1127 (9th Cir. 2000). In the Ninth Circuit, "[d]irect evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption," while circumstantial evidence "requires an additional inferential step to demonstrate discrimination." *Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1095 (9th Cir. 2005).

Although "very little" direct evidence may be sufficient, a plaintiff relying on circumstantial evidence must produce evidence that is "specific" and "substantial" to create a triable issue of pretext. *Id.*; *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221–22 (9th Cir. 1998), *as amended* (Aug. 11, 1998). The plaintiff need not always produce additional, independent evidence of discriminatory animus beyond evidence that the employer's explanation is false; a "prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000). But the ultimate question remains whether the stated explanation is false or improperly motivated, not merely that the employer's process was subjective. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 519, (1993); *Hittle v. City of Stockton, California*, 101 F.4th 1000, 1016–17 (9th Cir.

MEMORANDUM DECISION AND ORDER - 14

2024); *but see Noyes v. Kelly Servs.*, 488 F.3d 1163, 1170 (9th Cir. 2007) (summary judgment standard applies in this context).

Plaintiff argues Defendant's score-based explanation is pretextual for several reasons. He contends (1) Boden was not qualified to be promoted; (2) the scoring process lacked objective metrics because the evaluators produced substantial scoring disparities and the outside evaluators selected gave Plaintiff unusually low scores that materially affected the outcome; (3) the City's leadership and promotion history show a lack of Hispanic and non-LDS representation; and (4) Defendant's stated explanation should be viewed against that background. The Court considers those arguments collectively and in the light most favorable to Plaintiff.

As an initial matter, Plaintiff's reliance on subjective scoring and department demographics warrants distinguishing disparate-treatment analysis from disparate-impact analysis. Subjective employment practices may, in an appropriate case, be challenged under a disparate-impact theory if the plaintiff identifies the specific practice, shows a significant disparate impact on a protected class, and proves a causal relationship between the practice and the demonstrated impact. *See Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477, 1482 (9th Cir. 1987); *see also* 42 U.S.C. § 2000e-2(k). Plaintiff has not pled such a disparate-impact claim, and he has not produced evidence showing that the assessment-center scoring system caused a disparate impact on a protected class. The Court therefore does not analyze Plaintiff's claim under a disparate-impact framework.

That does not make the evidence irrelevant, however. Instead, the Court considers Plaintiff's evidence of subjectivity, evaluator discretion, and demographic background as circumstantial evidence bearing on whether Defendant's stated score-based reason was pretext for intentional discrimination. A plaintiff may rely on circumstantial evidence to prove pretext, and

MEMORANDUM DECISION AND ORDER - 15

the Court must draw reasonable inferences in the plaintiff's favor. But the inference must be one a reasonable jury could draw from the record, not speculation. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Circumstantial evidence connecting a challenged employment decision to protected status must be sufficiently specific and substantial to support that connection. *Coghlan*, 413 F.3d at 1095–96; *Hittle*, 101 F.4th at 1016–17. The Court does not consider this burden to be any higher than Plaintiff's more commonly stated burden on summary judgment of demonstrating a genuine issue of material fact.

Plaintiff cumulatively argues that BFD's leadership allegedly lacked Hispanic and non-LDS representation despite Burley's general population demographics; Boden, whom Plaintiff identifies as Caucasian and LDS, was promoted despite having served as Lieutenant for only approximately six months; Deputy Chief Harman had a role in screening candidates, selecting outside evaluators, evaluating the candidates, and discussing the results; the outside evaluators selected by Deputy Chief Harman scored Plaintiff much lower than the internal evaluators which impacted his chances; and Plaintiff testified that he felt excluded from a workplace social group and perceived differential treatment of Hispanic firefighters (Dkt. 22 at 12-14; Dkt. 22-2 at 3-4; Dkt. 22-4 at 1-2; Dkt. 22-5, Munoz Dep. 86:14-91:10). In light of the analysis below, these issues do not permit a reasonable jury to find that the challenged promotion decision was motivated by discriminatory intent or that the stated explanation is false.

### 1.    Boden's Qualifications

Plaintiff first argues Defendant's explanation is unworthy of credence because Boden allegedly was not qualified to apply for or receive the Captain position. Plaintiff emphasizes that Boden had been a Lieutenant only since December 2021 before he was promoted to Captain in

**MEMORANDUM DECISION AND ORDER - 16**

July 2022. Plaintiff therefore contends Boden lacked two years of Lieutenant experience, which Plaintiff characterizes as a minimum qualification for Captain.

The Captain job description states that "*any combination of experience and training* that would likely provide the required knowledge and abilities" is qualifying and then describes a "typical" and "preferred" experiential path of five years of increasingly responsible full-time fire-department experience, including at least two years as a Lieutenant (Dkt. 19-5 at 12) (emphasis added). Allowing a "combination" of experience and training to be qualifying establishes that the "preferred" two-year requirement was not a minimum requirement and at most was a preferred path for experiential qualification. Whether Boden met it or not, then, would not render him unqualified.

Plaintiff disputes Deputy Chief Harman's interpretation of the two-year Lieutenant language, but the record does not support Plaintiff's reading or a finding that BFD either strictly enforced the updated requirements against Plaintiff or relaxed them only for Boden. To the contrary, the record shows that, during the grace period, BFD allowed internal candidates to apply and participate even if they did not possess all updated certification requirements. That supports a dispute over the wisdom in allowing "any combination" to suffice, but it does not materially advance Plaintiff's argument that having less than two years rendered Boden unqualified. It also does not show that the City's stated reliance on the highest total score was false or connect any qualification determination to Plaintiff's race or religion. Without more, this does not permit a reasonable jury to find that Defendant's score-based explanation was pretextual.

### 2. The Scoring Process: Subjectivity, Lack of Metrics, and Evaluator Disparities

Plaintiff's principal pretext argument concerns the assessment process that produced the scores. He argues the process lacked objective metrics, evaluators were not told how to translate

**MEMORANDUM DECISION AND ORDER - 17**

performance into particular numerical scores within the 1-to-10 scale, the outside evaluators scored Plaintiff unusually low, and those outside scores materially affected the result. Subjective selection criteria may be probative in employment-discrimination cases. *Nanty v. Barrows Co.*, 660 F.2d 1327, 1334 (9th Cir. 1981), *overruled on other grounds by O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756 (9th Cir. 1996); *O'Brien v. Sky Chefs, Inc.*, 670 F.2d 864, 867 (9th Cir. 1982), *overruled on other grounds by Atonio*, 810 F.2d 1477.

Here, Defendant has not asserted that the assessment center was wholly objective, mechanically scored, or free from evaluator judgment. Its stated reason is narrower: after the candidates completed the prescribed assessment process, Boden received the highest total score, and the City promoted the highest-scoring candidate. Plaintiff does not dispute that Defendant's score-based explanation is facially legitimate and nondiscriminatory (Dkt. 22 at 8). Thus, evidence that the assessment process involved subjective evaluator judgment does not, by itself, show that Defendant was motivated by discrimination or that its stated reason is false or unworthy of credence. It shows that the facially legitimate score-based process had discretionary components.

Indeed, the record supports Plaintiff's argument that the assessment process involved substantial discretion. The assessment materials identified scoring categories and a numerical scale, but evaluators were not given specific instructions on how to assign particular scores within each category (Dkt. 22 at 19-20; Dkt. 22-1 at 3-5). Buehler's testimony illustrates the point. He testified that, when scoring the "educational background" component, he considered a "motivational factor," including where candidates were in their careers; how long they had been with the department; and what certifications they had. He reasoned that someone who had been with the department for fifteen years with only minimal certifications could appear less motivated than someone who had been with the department for a year or two and was "getting cert after cert"

**MEMORANDUM DECISION AND ORDER - 18**

(Dkt. 22-9, Buehler Dep. 20:14-21:5). Whether or not those considerations were appropriate under the educational-background category, they support Plaintiff's argument that scoring was not purely mechanical. It does not, however, support a reasonable inference that Buehler's judgment was based on Plaintiff's protected class status.

In short, subjectivity does not automatically establish disparate-treatment pretext. Plaintiff must still identify evidence from which a reasonable jury could infer that subjectivity was exercised because of protected status. *See Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1038–41 (9th Cir. 2005). The record supports an inference that the outside evaluators scored Plaintiff harshly and that their scoring materially widened the gap between Plaintiff and Boden. It may even support an inference that evaluators used different baselines. But Plaintiff identifies neither evidence that the low scores were assigned because Plaintiff is Hispanic, Catholic, or non-LDS, nor evidence that Deputy Chief Harman selected the outside evaluators for that discriminatory purpose.

Setting aside subjectivity, the evaluator's scoring disparities are significant and warrant independent analysis. On their face, those disparities could support an inference that evaluators applied materially different baselines; indeed, Deputy Chief Harman testified that because the process was internal, BFD was familiar with the applicant's experience (Dkt. 22-6, Harman Dep. 15:23-16:9, 18:22-20:7). Outside evaluators would not be. The disparities do not, without more, support a reasonable inference that the scores were produced because Plaintiff is a member of a protected class. Indeed, Plaintiff does not contend that Buehler or Hendrickson personally considered race or religion when scoring him. Instead, he frames his theory as Deputy Chief Harman selecting Buehler and Hendrickson to score the candidate Deputy Chief Harman allegedly

**MEMORANDUM DECISION AND ORDER - 19**

already favored and to score the other candidates substantially lower (Dkt. 22-1 at 6).[2] Viewed in Plaintiff's favor, that may infer possible favoritism or outcome-driven structuring. But it does not contain evidence that the scoring process was a proxy for race or religion discrimination.

The record also contains performance-based evidence explaining at least some of Plaintiff's lower scores. Hendrickson testified Plaintiff was "very argumentative" during the scenario; he questioned the scenario rather than simply providing the scene size-up; and this affected her assessment of his scene size-up, leadership, organization, and safety (Dkt. 22-10, Hendrickson Dep. 35:23-36:5, 37:2-22). Plaintiff may disagree with those subjective judgments, but the existence of a plausible explanation does not support Plaintiff's position.

The post-assessment discussion evidence likewise does not materially advance Plaintiff's pretext showing. HR Director Anderson testified that evaluators typically would discuss the process, what happened, things that were said and done, and the overall scores, but she did not recall discussing the scores each evaluator assigned (Dkt. 22-8, Anderson Dep. 38:8-39:7). Deputy Chief Harman testified that, after the scores were totaled, he discussed the overall points, ranking, and point spread with Chief Tolman, HR Director Anderson, and the city administrator, but that they did not pull out the score sheets and discuss each evaluator's individual scoring sheet (Dkt. 22-6, Harman Dep. 67:9-68:24, 68:1-9, 70:8-11). That evidence shows end-of-process discussion about overall results and rankings. It does not allow a reasonable juror to infer that Plaintiff's scores were due to his protected class status.

---

[2]      The arithmetic also limits, though it does not independently defeat, Plaintiff's outside-evaluator theory. Including the outside evaluators, Boden outscored Plaintiff by 197 points. Excluding the outside evaluators entirely, Boden still outscored Plaintiff by 34 points. This does not answer whether the process was discriminatory, but it reduces the probative force of Plaintiff's argument that the outside evaluators' scores alone explain the promotion outcome.

For these reasons, the scoring evidence does not create a triable issue of discriminatory pretext. Even if a reasonable jury could find that subjective judgment, evaluator harshness, or favoritism influenced the process, Plaintiff has not identified evidence permitting a reasonable jury to find that race, religion, Catholic status, or non-LDS status was one of the motivating factors. On this record, Plaintiff has not identified sufficient admissible evidence from which a reasonable jury could infer Defendant's stated explanation is false or motivated by a discriminatory purpose.

### 3.       Demographic and Leadership-Composition Evidence

Plaintiff relies on area demographics, leadership composition, and the relative lack of Hispanic or non-LDS representation in BFD leadership positions to argue the process was motivated in part by Plaintiff's protected class. He asserts that, although Burley and the surrounding area include a significant Hispanic population, BFD's highest-ranking positions are held by Caucasian employees and most are held by individuals with LDS connections (Dkt. 22 at 12-14; Dkt. 22-1 at 5-6; Dkt. 22-2 at 3-4).

As noted above, the Court has considered that evidence, but it does not materially strengthen Plaintiff's pretext showing here. Plaintiff correctly notes that statistical and pattern evidence may be relevant in a disparate-treatment case. *See O'Brien*, 670 F.2d at 867. But *O'Brien* involved broader class and individual promotion claims, statistical evidence, evidence of undefined promotion criteria, and specific instances of alleged promotion discrimination beyond the named plaintiffs. *Id.* at 866–68. In cases with large sample sizes, statistical evidence would be probative. This case, by contrast, concerns an individual failure-to-promote claim arising from the June 2022 Captain process. Plaintiff's population data is only minimally probative.

Moreover, the relevant comparison is not between BFD leadership and the general population of Burley or Cassia County, but between BFD leadership or promotion outcomes and

the pool of persons eligible to apply for the Captain position. Plaintiff has not identified evidence showing the racial or religious composition of that eligible applicant pool, including firefighters who met or could satisfy the applicable rank, experience, certification, and internal-application requirements. Without that comparator evidence, general population data—and the arguments concerning the number of Caucasians in leadership positions at BFD—does not, alone, support an inference that the Defendant's rationale is pretextual.

Further, although Plaintiff alleges prior unsuccessful Captain applications and prior promotions of Caucasian/LDS candidates, he does not identify evidence showing how those earlier processes were conducted; who applied; who met the relevant qualifications; who evaluated the candidates; what criteria applied; what scores were assigned; who made the decisions; or whether the same decisionmakers were involved. Without that information, the prior-promotion evidence provides only limited background context. *See Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 663–64 (9th Cir. 2002), *as amended* (July 18, 2002) (explaining that statistical evidence in an individual disparate-treatment case rarely suffices by itself to rebut an employer's legitimate explanation and must account for nondiscriminatory variables).

The Court does not discount the reality that discrimination is often proved through circumstantial evidence, including evidence that subjective procedures operated as a vehicle for discriminatory decision-making. But the record must still permit a reasonable inference that the challenged decision was made because of a protected characteristic. Even assuming Plaintiff's demographic and leadership-composition evidence is admissible and considered, it remains too general and too attenuated from the June 2022 promotion decision on this record to create a triable issue that the scoring process or promotion decision was motivated by race or religion.

MEMORANDUM DECISION AND ORDER - 22

The religious-discrimination claim has an additional proof problem. Plaintiff has not identified evidence that the relevant evaluators or decisionmakers knew, during the June 2022 assessment process, that Plaintiff was Catholic or non-LDS. Plaintiff testified that religion did not come up during the interview or testing process; no panelist raised religion; he did not discuss his religion with Chief Tolman or Deputy Chief Harman; and he did not know whether they knew his religion. The outside evaluators likewise testified they did not know the applicants' religious affiliations. Without evidence of decision-time knowledge, a reasonable jury could not find that Defendant failed to promote Plaintiff because he was Catholic or non-LDS. *See Robinson v. Adams*, 847 F.2d 1315, 1316–17 (9th Cir. 1987).

When asked why he believed race or religion played a role, Plaintiff referred to a social group he did not feel part of, identified himself as the first Hispanic person hired by the City, and identified himself as Catholic (Dkt. 22-5, Munoz Dep. 86:14-88:14). When asked what he had observed that made him think race was a factor in not being promoted, Plaintiff described perceived differential treatment of Hispanic firefighters, including delays in Hispanic firefighters receiving service pins and a white employee receiving a fifteen-year service pin after thirteen years (Dkt. 22-5, Munoz Dep. 88:9-91:10). That testimony is relevant as circumstantial evidence of Plaintiff's perception that Hispanic firefighters received less recognition. But the record does not show that service pins affected pay, rank, promotion eligibility, scoring, or the June 2022 Captain decision; it also contains no other information about those individuals to determine whether they are proper comparators. Nor does the service-pin testimony identify evidence that Harman, the evaluators, or any relevant decisionmaker used race or religion in the assessment process.

**MEMORANDUM DECISION AND ORDER - 23**

**4.** **Cumulative Consideration**

Considered cumulatively, Plaintiff's evidence shows a discretionary process, a small leadership pool with limited Hispanic and non-LDS representation, sharp evaluator disparities, and Plaintiff's perception that Hispanic firefighters received less recognition. That evidence is sufficient to require careful review, but it remains insufficient to permit a reasonable jury to find that Defendant's score-based explanation was false or that the June 2022 decision was motivated by race or religion.

## ORDER

**IT IS ORDERED** that Defendant City of Burley's Motion for Summary Judgment (Dkt. 19) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Court will enter judgment separately in favor of Defendant and close this case.

DATED: June 03, 2026

Amanda K. Brailsford
U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 24